UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLARENCE HINES and KIMBERLY
SIMPSON,

    Plaintiffs,

v.

    Case No. 06-11263

    Honorable Patrick J. Duggan

THE CITY OF BRIGHTON, DANA
FOSTER, and KIMBERLY CASTLE,

    Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on February 5, 2007.

PRESENT:     THE HONORABLE PATRICK J. DUGGAN
                     U.S. DISTRICT COURT JUDGE

Clarence Hines and Kimberly Simpson (collectively "Plaintiffs") filed this action against the City of Brighton, Dana Foster, City Manager, and Kimberly Castle, Community Development Director, (collectively "Defendants") for alleged deprivations of their constitutional rights under 42 U.S.C. §§ 1981, 1983, and 1985, and a violation of Michigan common law. Plaintiffs' Complaint asserts the following counts: Count I (Denial of Equal Protection); Count II (Denial of Substantive Due Process); Count III (Denial of Procedural Due Process); Count IV (Conspiracy); Count V (Denial of Right to

Enforce Contracts); and Count VI (Tortious Interference With Contractual Relations). Presently before this Court is Defendants' motion to dismiss for judgment on the pleadings or, in the alternative, for summary judgment filed on August 30, 2006. Plaintiffs have not responded to Defendants' motion, and the time for response has expired. *See* E.D. Mich. L.R. 7.1(d)(1)(B).[1]

### I. Background[2]

Plaintiff Hines, an African-American male, operated an antique business and café on the first floor of his building, which is located at 116 W. Main Street in downtown Brighton, Michigan. The business was known as "Nostalgia, Days Gone By Antiques" ("Nostalgia"). (Compl. ¶1). In the summer of 2002, Plaintiff Hines and Plaintiff Simpson, a Caucasian female, decided to enter into a partnership and expand Nostalgia to the second floor of Plaintiff Hines' building. (*Id.* ¶29). The Plaintiffs planned to expand to the second floor, which would be operated in a "tearoom format" by Plaintiff Simpson. (*Id.* ¶30). Plaintiffs expended thousands of dollars in the expansion. (*Id.* ¶31). Subsequently, the City of Brighton became aware of Plaintiffs' operation on the second floor when a new sign was erected on the front of the building advertising for the "La Petite Victorian Tea Room" ("Tea Room"). (Dfts.' Ex. A at 1).

---

[1] On August 30, 2006, the Court's Deputy Clerk sent counsel for Plaintiffs and counsel for Defendants a notice "reminding" them that a response to a motion for summary judgment shall be filed within 21 days after service of the motion.

[2] As stated above, Plaintiffs have failed to respond to Defendants' motion. Thus, the Court finds that the facts presented by Defendants are uncontroverted, and will determine whether these facts show that there is no genuine issue of fact warranting summary judgment. *Guarino*, 980 F.2d at 407.

According to a memorandum prepared by Defendant Dana Foster for the City Council, the City, after learning about the sign, contemplated bringing an enforcement action against Plaintiffs for failing to obtain the requisite sign permit, but it decided not to when a local newspaper ran an article announcing the opening of the Tea Room. (Ex. A at 1). In her memorandum, Defendant Foster stated that she recognized that this was a "sensitive situation" for three reasons. First, the City had been losing businesses on Main Street as a result of the recent economic downturn and the City did not want to discourage new businesses in the area. (*Id.*). Second, Defendant Foster explained that she knew that Plaintiff Hines had previously been involved in a dispute with the person occupying the adjacent building regarding the use of an alley between the two buildings. (*Id.* at 1-2). Finally, Defendant Foster knew that Plaintiff Hines' previous attempt to begin a food-service operation on the first floor of his building was denied and Plaintiff Hines was unhappy about the denial. (*Id.* at 2).

On January 29, 2001, Mike Butzke, Building Official for the City, confirmed that he had received a building permit application for the proposed construction on the interior of Plaintiff Hines' antique store. (Ex. B). In this letter, Mr. Butzke stated:

> Prior to issuing a permit I am sending notification to you stating the only use permitted for the upstairs is for expansion of the first floor retail. Any other use is restricted by the Michigan Barrier Free Code and Fire Safety. Any other use, as well could trigger site plan review.

(*Id.*).

Sometime after learning of the Plaintiffs' sign advertising the second floor Tea Room, the City began investigating Plaintiffs' operation. In addition, in the fall of 2002

3

after her staff brought the sign to her attention, Defendant Foster contacted the Livingston County Health Department ("LCHD").  (Ex. A. at 2).  Apparently, it was a "longstanding standard practice" for LCHD to contact the city when LCHD received a food service permit application.  (*Id.*).  After contacting LCHD, Defendant Foster learned that LCHD had issued a food service permit to Plaintiff Hines for the operation of the Tea Room without contacting the City.  (*See id.*).  This information was later verified at a meeting Defendant Foster "conducted in City Hall with [City] Inspectors and with the [LCHD] Director."  (*Id.*).

Subsequently, Defendant Foster directed her staff to meet with the Fire Authority Inspector and Plaintiff Hines.  (Ex. A at 3).  Several meetings took place between Defendant Foster's staff, Defendant Castle, the Fire Authority Inspector, and Plaintiff Hines.  At these meetings, Plaintiff Hines was asked to voluntarily take steps to comply with the alleged building code violations.  (*Id.* at 3).  According to Defendant Foster, the request for voluntary compliance consisted of allowing Plaintiff Hines to "to continue the Tea Room operation while at the same time moving forward definitively within an agreed-upon timetable to make code violation corrections (especially the Fire code violations), AND to submit a site plan application to get the site plan review process started/going."  (*Id.*).

Ultimately, Plaintiffs missed the established deadlines and a "full-scale enforcement action" was undertaken by the City.  (*Id.*).  On January 14, 2003, James W. Savage, Building Inspector for the City, sent a letter to Plaintiff Hines stating that he had inspected the Tea Room and that he had "serious concerns about the floor load."  (Ex. C.).

4

He also stated:

> [Y]ou shall restrict the occupancy of the La Petite Victorian Tea Room to 25 persons including employees. This restriction will be reviewed upon your submission of a Floor Load Certification that was requested on January 2, 2003 and required to be submitted to the City by January 15, 2003.

(*Id.*).

Afterwards, Plaintiffs, their former attorney, Mark L. Fischer, and various City officials met on several occasions. During one of these meetings, Tim King, the City's Fire Inspector, requested that Plaintiffs submit multiple Action Plans detailing their progress on correcting code violations. Plaintiffs submitted one Action Plan on January 30, 2003, according to a letter written by Mr. Fischer. (*Id.*). In that letter, however, Plaintiffs contested the Fire Department's "new occupancy classification" and suggested an "alternative method[] of addressing the items listed in the Department's report." (Ex. E at 1). According to another letter dated March 10, 2003, Plaintiffs submitted a revised Action Plan, which was requested in a February 13, 2003 conference with Plaintiffs, Mr. Fischer, Mr. King, and Defendant Castle. (Ex. E at 6).

On the same day, March 10, 2003, Mr. King acknowledged the receipt of Plaintiff's revised Action Plan. (Ex. F.). Mr. King, however, was not satisfied with the revised Action Plan. He expressed his dissatisfaction in a letter to Mr. Fischer, where he stated:

> I received your revised action plan today, and I see that either I did not make myself clear or you did not understand the opinion we discussed. The completion times on some of the items are not acceptable; these are life safety issues and need to be completion [sic] in a timely manner. . . . Let it be understood that we have moved from the understanding/explanation of the required code to the

5

completion stage.

(Ex. F at 1). Mr. King's letter went on to explain how and when the issues presented in Plaintiffs' revised Action Plan must be addressed. (*Id.* 1-8). Plaintiffs confirmed the receipt of Mr. King's letter on March 24, 2003. (*Id.* at 8).

Two days later, on March 26, 2003, Plaintiffs were sent a letter from the City informing them that they were "in violation of Sections 110, 115, and 301 of the 2000 Michigan Building Code and Brighton City Code Sections 18-47 and 18-48." (Ex. G). The letter, which Defendants refer to as an Order of Closure, stated: "[i]n order for this order to be lifted, full compliance with applicable codes, ordinances, and regulations must be achieved. No occupancy of the building will be permitted until compliance is achieved." (*Id.*). On May 15, 2003, Plaintiffs appealed the Order of Closure to the City Council. (Ex. H).

While Plaintiffs' appeal was pending and after it was adjourned to give Plaintiffs an opportunity to work on a resolution, Mr. Fischer met with City Attorney Paul Burns at Mr. Burns' office on June 3, 2003. (*See id.*). At this meeting, it was apparently "agreed that [the parties] would work towards operating the Tea Room on the first floor, in conjunction with the Antique Store, on a temporary basis in order for [Plaintiffs] to complete the necessary work and achieve the necessary approvals for the Tea Room to open on the second floor." (*Id.*). Furthermore, Plaintiffs were informed "of the need to submit a site plan application and the need . . . to hire an architect." (*Id.*).

Mr. Fischer met with Mr. Burns again on June 13, 2003. (*Id.* at 2). Mr. King and Roger Young of the Fire Department also attended this meeting "to discuss the fire safety

6

code issues that would need to be rectified in order to have the Tea Room and the Antique Store on the first floor." (*Id.*). Again, Plaintiffs were informed that they needed to submit a site plan application and hire an architect. (*Id.*). Mr. Burns advised Mr. Fischer of these requirements again at meetings on June 18 and 19, 2003.

On June 19, 2003, Mr. Fischer appeared on behalf of Plaintiffs at a City Council meeting. At the City Council meeting, Mr. Fischer informed the City Council and their staff of his clients' desire to work on improving the second floor in order to operate the Tea Room. (*Id.*). Another meeting held on June 24, 2003 was attended by Mr. Fischer, Mr. Burns, Defendant Castle, and Jack Donaldson (consultant to Building Code and Enforcement Department). (*Id.*). Compliance issues were again discussed at this meeting, including the need to submit a site plan application and the need to hire an architect. (*Id.*). At the June 24, 2003 meeting, Mr. Fischer agreed that Plaintiffs would submit a site plan application and special use application by July 7, 2003, so that the applications could be placed on the agenda for the July 21, 2003 Planning Commission meeting. (*Id.*).

Plaintiffs did not meet the July 7, 2003 deadline, and on July 21, 2003, Mr. Fischer contacted Mr. Burns indicating that Plaintiffs were not prepared for the Planning Commission meeting and had not hired an architect. (*Id.* at 3). Mr. Fischer also requested an adjournment of the July 21, 2003 Planning Commission meeting. (*Id.*). The City Council, which had published a notice of public hearing for Plaintiffs' special use permit application, tabled the July 21, 2003 hearing. (*Id.*). Subsequently, Mr. Fischer contacted Mr. Burns to indicate that Plaintiffs were interested in continuing their appeal

7

of the Order of Closure before the City Council. (*Id.*).

On August 7, 2003, after Plaintiffs failed to send a letter indicating their interest in continuing their appeal, Mr. Fischer attended the City Council meeting requesting a vote on Plaintiffs' appeal. (*Id.*). At that time, Mr. Fischer submitted additional documentation in support of Plaintiffs' appeal. (*Id.*). At the meeeting, the City Council informed Mr. Fischer that it was unable to vote on the appeal because it was not on the agenda. (*Id.*). The City Council then placed Plaintiffs' appeal on the August 21, 2003 agenda. (*Id.* at 4).

Once Plaintiffs' appeal was placed on the agenda, the City Council held two hearings. (*See* Ex I). Mr. Fischer appeared on behalf of Plaintiffs at each of these hearings. (*Id.* at 1,5). At the first hearing held on August 21, 2003, numerous representatives, including Defendants Foster and Castle, appeared on behalf of the City to provide the facts giving rise to Plaintiffs' appeal. (*Id.*). The City Council tabled the appeal on August 21, 2003 to allow for the City and Mr. Burns to assemble a packet of information containing specific documents needed to vote on Plaintiffs' appeal. (*Id.* at 12).

Ultimately, on October 2, 3003, the City Council found that "the City's Notice of Closure for 116 W. Main Street was proper in that although there may have been technical deficiencies in the notice, [Plaintiffs were] provided with actual notice of defects prior to the closure over a period of approximately nine (9) months." (*Id.* at 1). Because Plaintiffs' had failed to make an application for site plan review, despite numerous requests and opportunities to do so, and the fact that the City Council found that "Life-Safety" issues remain, Plaintiffs' appeal was denied. (*Id.* at 3).

8

Apparently, Plaintiffs "spent the next few years trying, unsuccessfully, to sell 116 W. Main Street." (Dfts.' Br. at 7). Plaintiffs commenced this action on March 24, 2006.

## II.  Standard of Review

Defendants seek judgment on the pleadings pursuant to Rule 12(b)(6) or, in the alternative, summary judgment pursuant to Rule 56. Because this Court is considering matters outside the pleadings to make its decision, it will apply the standard for summary judgment set forth in Rule 56 of the Federal Rules of Civil Procedure. FED. R. CIV. P. 12(b)(6).

This Court will grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists for trial unless, by viewing the evidence in a light most favorable to the nonmoving party, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The moving party bears the burden of informing this Court of the basis for its motion and identifying those portions of the record that establish the absence of a material issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to look beyond the pleadings and designate specific facts showing that a genuine issue exists for trial. FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 322-24, 106 S. Ct. at 2552-53. It is not enough that the nonmoving party comes forward with the "mere existence of a

scintilla of evidence . . . ," *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512, or some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Rather, the nonmoving party must present significant probative evidence in support of its opposition to the motion for summary judgment. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

Where, as here, a party has failed to respond to a motion for summary judgment, the Court must "carefully review the legitimacy of such an unresponded-to motion, even as it refrains from actively pursuing advocacy or inventing the riposte for a silent party." *Guarino v. Brookfield Township Trs.*, 980 F.2d 399, 407 (6th Cir. 1992). The Court need not search the entire record on behalf of the non-moving party, but need only determine, without ignoring evidentiary misstatements and the context in which statements are made, if the moving party has met its burden of showing the absence of a genuine issue of material fact. *See id.* at 406-07.

**III.   Applicable Law and Analysis**

Plaintiffs' Complaint contains six separate counts. Counts I-III arise under 42 U.S.C. Section 1983, which provides a civil cause of action to anyone who suffers a deprivation of their constitutional rights by a person acting under the color of state law. 42 U.S.C. § 1983. Count IV arises under 42 U.S.C. Section 1985(3), which provides a civil cause of action when two or more persons conspire to deprive another of the equal protection of the laws. 42 U.S.C. § 1985(3). Count V arises under 42 U.S.C. Section 1981, which provides that all persons regardless of race shall have the right to make and

10

enforce contracts. 42 U.S.C. § 1981. Finally, Count VI asserts a claim for tortious interference with contractual relations under Michigan common law.

Defendants move to dismiss or, in the alternative, for summary judgment on all counts. Therefore, the Court will analyze each count individually.

### A.     Denial of Equal Protection

Count I of Plaintiffs' Complaint, which consists of seventy-one (71) numbered paragraphs, alleges that Defendants' violated the Equal Protection Clause of the 14th Amendment. (Compl. ¶¶ 20-90). The Equal Protection Clause commands that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV. Essentially, "[t]he Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Trihealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005)(citing *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 312 (6th Cir. 2005)). "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is show, the equal protection analysis to be applied is determined by the classification used by the government decision-makers." *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).

Defendants contend that because Plaintiffs' allegations are not challenging the facial validity of the licensing, building code, and zoning ordinances, their equal protection claim must be construed as one of selective enforcement. This Court, however, does not believe it needs to determine which theory of equal protection Plaintiffs are invoking.

11

Rather than confining its analysis to a specific theory, this Court will analyze Plaintiffs' equal protection claim generally because the Court believes the claim fails for a more basic reason.

Plaintiffs have failed to set forth any evidence that similarly situated individuals were treated differently. Although Plaintiffs' Complaint contains allegations that other white proprietors in downtown Brighton expanded and modified their establishments without interference from Defendants, (Compl. ¶¶ 26-28, 88-89), this action has progressed beyond the pleading stage. Plaintiffs are now required to show how the evidence illustrates that a genuine issue of fact exists as to whether they were treated disparately. Because Plaintiffs have failed to do so, summary judgment is appropriate.

### B.  Denial of Substantive Due Process

Plaintiffs' second cause of action, entitled "Denial of Substantive Due Process," alleges that Defendants' actions in prohibiting Plaintiffs from operating the second-floor Tea Room were arbitrary and capricious because they "were taken without basis in fact or law." (Compl. ¶ 91-100). The Sixth Circuit has stated that "[s]ubstantive due process 'serves as a vehicle to limit various aspects of potentially oppressive government action.'" *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997)(quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)). There are two categories of substantive due process claims: "(1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'" *Id.* (citations omitted). "Where the government action does not deprive a plaintiff of a particular constitutional guarantee or shock the conscience, that action survives the scythe of

12

substantive due process so long as it is rationally related to a legitimate state interest." *Id.* In such a case, a plaintiff "bears the burden to show that [d]efendants' decision was not rationally related to a legitimate state interest." *Id.*

Defendants contend that their actions were based on legitimate public health, safety, and welfare concerns, including the "Life-Safety" issues described at the City Council hearings. (*See* Ex. I). Again, Plaintiffs have failed to respond to this motion with any evidence as to what constitutional guarantee they were allegedly deprived of, or which actions taken by which Defendant allegedly shock the conscience. Therefore, on the present record, this Court does not believe that a genuine issue of fact exists with respect to Plaintiffs' substantive due process claim.

### C.     Denial of Procedural Due Process

Plaintiffs' third cause of action, entitled "Denial of Procedural Due Process," contains the following three paragraphs of allegations:

> 102.   That Plaintiffs were never given a clear notion of how to go about achieving the expansion of the café, but ended up being told to deal with Defendant Castle.
>
> 103.   That Defendants denied Plaintiffs both procedural and substantive due process when they pretended to be working out their differences, but never intended to resolve any differences, e.g., telling Plaintiffs that they would have time to correct the deficiencies, but activity a notice of closure three (3) days later and showing up with the City Police Department.
>
> 104.   That Defendants denied Plaintiffs both substantive and procedural due process when they called up customers booked by Plaintiffs, particularly, Plaintiff Simpson, and caused them to cancel bookings.

13

(Compl. ¶¶ 102-04). The Due Process Clause of the Fourteenth Amendment guarantees that "[n]o State . . . shall deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Procedural due process claims are analyzed under a two-part test. "First, the court must determine whether the interest at stake is a protected liberty or property right under the Fourteenth Amendment. Only after identifying such a right [does a court] continue to consider whether the deprivation of that interest contravened notions of due process." *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002)(citations omitted).

Defendants contend that Plaintiffs procedural due process claim must fail because they cannot establish that they were denied a constitutionally protected liberty or property interest without the appropriate process. The Court is unable to determine the property or liberty interest alleged by Plaintiffs. Plaintiffs' allegations simply assert the alleged wrongdoings of Defendants and do not allege any property or liberty interest they were entitled to under the Fourteenth Amendment. Without any evidence for the Court to determine the property or liberty interest at stake, the Court cannot determine the amount of process due. Therefore, Defendants are entitled to summary judgment on Plaintiffs' claim for procedural due process.

### D.     Conspiracy Under 42 U.S.C. § 1985(3)[3]

Count IV of Plaintiffs' Complaint alleges that Defendants "conspired to stop

---

[3]Although the allegations contained under Count IV of Plaintiffs' Complaint do not specifically refer to Section 1985(3), paragraph thirteen of the Complaint states that Plaintiffs are bringing their "claims" pursuant to this specific section. (Compl. ¶13). Therefore, the Court will construe Count IV as such.

14

Plaintiffs in their efforts to expand the café for illicit reasons, including race, through the use of illicit means." (Compl. ¶106). The Sixth Circuit has stated:

> To establish a claim under 42 U.S.C. 1985(3), a plaintiff must prove (1) a conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States. *Hilliard v. Ferguson*, 30 F.3d 649, 652-53 (5th Cir. 1994). Plaintiff must also establish that the conspiracy was motivated by class-based animus.

*Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994).

Defendants contend that, like their Equal Protection Claim, Plaintiffs' conspiracy claim must fail because there is no evidence that the alleged conspiracy was motivated by class-based animus. Defendants also argue that the proffered evidence shows that the Order of Closure was issued as a result of Plaintiffs failure to comply with the applicable building and fire codes. (*See* Ex. G).

Plaintiffs have failed to produce any evidence supporting their claim that Defendants' conspired, much less that the alleged conspiracy was motivated by class-based animus. Consequently, summary judgment is appropriate as to Count IV of Plaintiffs' complaint.

**E.     Denial of Right to Enforce Contracts Under 42 U.S.C. § 1981**

Plaintiffs allege in Count V of their Complaint that Defendants learned of the contractual arrangement entered into between Plaintiffs and "tortuously [sic] acted to destroy that relationship . . . ." in violation of 42 U.S.C. Section 1981. (Compl. ¶¶111-14). The burden shifting approach developed by the Supreme Court for Title VII cases in

15

*Texas Dep't of Cmty. Affairs v. Burdine*[4] and *McDonnell Douglas Corp. v. Green*[5], 411 U.S. 792, 93 S. Ct. 1817 (1973) applies to Section 1981 claims. *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S. Ct. 2363, 2377-78 (1989). Under this well-established framework, the plaintiff has the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. *Patterson*, 491 U.S. at 186, 109 S. Ct. at 2377-78. Once the plaintiff establishes a prima facie case, an inference of discrimination arises. *Id.* at 187, 109 S. Ct. at 2378. In order to rebut this inference, the defendant must present evidence of a legitimate, non-discriminatory reason for its conduct. *Id.* The burden then shifts back to the Plaintiff to demonstrate that the defendant's proffered reason was pretextual. *Id.*

Defendants contend that Plaintiffs cannot produce evidence to show that Defendants' non-discriminatory reasons for issuing the Order of Closure were pretextual. Even if Plaintiffs could establish a prima facie case of discrimination, Defendants have produced evidence to show that issuing the Order of Closure was based on legitimate, non-discriminatory reasons – i.e., Plaintiffs' failure to correct the existing code violations in the operation of the second floor Tea Room. Plaintiffs fail to present evidence demonstrating that a genuine issue of fact exists as to whether Defendants' proffered reasons were pretextual. Therefore, Defendants are entitled to summary judgment with respect to Count V.

---

[4] 450 U.S. 248, 101 S. Ct. 1089 (1981).

[5] 411 U.S. 792, 93 S. Ct. 1817 (1973).

16

### F.     Tortious Interference With Contractual Relations

Count VI alleges that Defendants tortiously interfered with the contractual relationship of Plaintiffs under Michigan law.  Under Michigan law, "one who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Feldman v. Green*, 138 Mich. App. 360, 378, 360 N.W. 2d 881, 891 (1984).  "If Defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference."  *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 251 Mich. App. 125, 132, 649 N.W. 2d 808, 812 (2002)(citing *Feldman*, 138 Mich. App. at 369-70, 360 N.W. 2d at 886).

As an initial matter, this Court does not believe there is a genuine issue of fact as to whether Defendants' acts were wrongful per se.  Defendants issued the Order of Closure due to Plaintiffs' repeated failures to comply with the applicable codes, and Defendants provided Plaintiffs with ample opportunity to comply and communicated their willingness to achieve an amicable result.  Furthermore, Plaintiffs have not responded to Defendants' motion with any "specific, affirmative" acts corroborating their claim of tortious interference.  Therefore, summary judgment is warranted with respect to Plaintiffs' claim for tortious interference with contractual relations.

### G.     Defendant City of Brighton's Liability Under *Monell*

Finally, Defendants contend Plaintiffs' claims against the City of Brighton must also fail under *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018

17

(1978). The Supreme Court in *Monell* stated:

> Local governing bodies . . . can be sued directly under § 1983 . . . where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Id.* at 690-91, 98 S. Ct. at 2035-36. The Supreme Court, interpreting *Monell*, has stated that "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203 (1989)(emphasis in original).

Defendants construe the following paragraph under Count I (Denial of Equal Protection) of Plaintiffs' Complaint as an indication that Plaintiffs are seeking liability under *Monell*:

> 90. That Plaintiffs have suffered discrimination due to Defendants' customs, practices and procedures.

(Compl. ¶90). Defendants contend that Plaintiffs' claims against the City of Brighton cannot withstand a motion for summary judgment because they fail to identify and provide any evidence of the "customs, practices and procedures" that led to the alleged discrimination. This Court agrees. The absence of any evidence as to how the City of

18

Brighton *itself* caused the alleged equal protection violations necessitates a grant of summary judgment in Defendant City of Brighton's favor.

## IV. Conclusion

Plaintiffs have failed to respond to Defendants' motion with evidence showing a genuine issue of fact exists for trial. Therefore, summary judgment is appropriate as to all of Plaintiffs' claims against Defendants.

Accordingly,

**IT IS ORDERED**, that Defendants' motion to dismiss for judgment on the pleadings or, in the alternative, for summary judgment is **GRANTED**;

**IT IS FURTHER ORDERED**, that Defendants' Motion to Strike Plaintiffs' Answers to Requests for Admissions and Deem Requests Admitted is **DENIED AS MOOT**.

                                                s/PATRICK J. DUGGAN
                                                UNITED STATES DISTRICT JUDGE

Copies to:
James C. Barnes, Jr., Esq.
Joan M. Barnes, Esq.
James E. Tamm, Esq.

2:06-cv-11263-PJD-SDP   Doc # 28   Filed 02/05/07   Pg 20 of 20   Pg ID 276

20