UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLARENCE HINES and KIMBERLY
SIMPSON,

       Plaintiffs,

                                          Case No. 06-11263

v.

                                          Honorable Patrick J. Duggan

THE CITY OF BRIGHTON, DANA
FOSTER, and KIMBERLY CASTLE,

       Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' AMENDED MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on January 14, 2008.

PRESENT:      THE HONORABLE PATRICK J. DUGGAN
                      U.S. DISTRICT COURT JUDGE

Clarence Hines and Kimberly Simpson (collectively "Plaintiffs") filed this action

against the City of Brighton ("City"), Dana Foster, the City Manager, and Kimberly

Castle, the former Community Development Director (collectively "Defendants"),

alleging deprivations of their constitutional rights under 42 U.S.C. §§ 1981, 1983, and

1985, and a violation of Michigan common law. Plaintiffs' Complaint asserts the

following counts: Count I (Denial of Equal Protection); Count II (Denial of Substantive

Due Process); Count III (Denial of Procedural Due Process); Count IV (Conspiracy);

Count V (Denial of Right to Enforce Contracts); and Count VI (Tortious Interference With Contractual Relations). Presently before this Court is Defendants' "Amended Motion to Dismiss for Judgment on the Pleadings or, In the Alternative, for Summary Judgment." Defendants' motion has been fully briefed, and at the request of Plaintiffs' counsel, the Court cancelled the hearing on Defendants' motion.[1]

## I. __Background__

Mr. Hines, an African-American male, operated an antique retail business and café on the first floor of his building, which is located at 116 W. Main Street in downtown Brighton, Michigan. Mr. Hines's business was known as "Nostalgia, Days Gone By Antiques" ("Nostalgia"). (Compl. ¶1.) Mr. Hines's café offered "different types of coffees and teas and fruit punches," as well as "finger food, like biscuits and popcorn and hot dogs and things that you could grab quickly." (Dfts.' Mot. Ex. G, Simpson Dep. at 9.)

In April 2000,[2] Mr. Hines met Ms. Simpson, a Caucasian female, and they decided to enter into a partnership and expand Nostalgia to the second floor of Mr. Hines's building, which would be operated in a tea room format by Ms. Simpson. (*See id.* at 8-9,

---

[1]After this Court scheduled a hearing on Defendants' motion for October 4, 2007, Plaintiffs' counsel requested that the Court cancel the hearing as her husband, former lead counsel for Plaintiffs, is ill and they currently reside in Arizona. Pursuant to this request, the Court cancelled the October 4, 2007 hearing. In addition, Plaintiffs' counsel informed the Court by telephone that she intended to file a supplemental brief after all discovery was complete. Plaintiffs' counsel did so on October 19, 2007. Defendants filed a response to Plaintiffs' supplemental brief on November 9, 2007.

[2]The exact date of the expansion to the second floor is in dispute. Defendants contend that the expansion occurred in the summer of 2002. Plaintiffs maintain that it occurred in 2000.

20-21.)  In June 2002, Plaintiffs began operating the "La Petit Victorian Tea Room"

("Tea Room") on the second floor.  (*Id.* at 27.)  The Tea Room's menu featured salads,

pastries, sandwiches, and desserts.  (*See* Dfts.' Am. Mot. Ex. I at 2.)  In addition, a

brochure, presumably prepared shortly before or after the Tea Room opened, states that

"[t]he tea room is . . . available for private parties up to 400 people for special occasions

with a full menu option."  (*Id.* at 1.)

A May 22, 2003 memorandum prepared by Mr. Foster chronicles the actions that

occurred between the time Defendants discovered Plaintiffs' operation of the Tea Room

in June 2002 and the commencement of an enforcement action five to six months later.  In

his memorandum, Mr. Foster answered several questions posed by former City Council

Member Monet, one of which asked about the delay in commencing the enforcement

action.  (Dfts.' Mot. Ex. K (hereinafter "Foster Memo.").)  According to Mr. Foster, it

was not until an article featuring the Tea Room appeared in the newspaper and Plaintiffs

erected a sign outside the building that the City became aware of the tea room.  (*See id.*)

After accounting for the delay in commencing the enforcement action, Mr. Foster stated:

> We collectively realized that we immediately had a sensitive
> situation on our hands.  By that time there were indications of
> business difficulties again on Main Street due to the recent
> economic downturn. . . .  We also knew we had a sensitive
> situation on our hands because of some previous history with
> Mr. Hines when he first opened his business in Brighton; this
> included a significant dispute between him and Joe Monroe
> regarding the use of the private alley between Mr. Hines'
> property/building and Mr. Mueller's building/property that
> Monroe manages/managed. . . . During that Monroe-Hines
> dispute, both Monroe and Hines each became convinced that
> the City was colluding with one to oppose the other.  Mr.
> Hines actually made statements during that situation when her

[*sic*] first started his business that the City was aligned with
Mr. Monroe because of Mr. Hines' race.

We also knew the situation was going to be sensitive due to
what I reported on recently to Council with our knowledge
that Mr. Hines was rather unhappy with City staff regarding
his previous attempt of 2.5 years ago to start a food-service
operation on his 1st floor.  As Council hopefully knows from
reading my report on that subject yesterday; Mr. Hines did not
get anything close to what he was originally wanting to
achieve in that effort.

(*Id.* at 1-2.)

After his staff brought the sign to his attention, Mr. Foster contacted the Livingston

County Health Department ("LCHD").  (*Id.* at 2.)  According to Mr. Foster, it was a

"longstanding standard practice" for LCHD to contact the City when LCHD received a

food service permit application.  (*Id.*)  After contacting LCHD, Mr. Foster learned that

LCHD had issued a food service permit to Mr. Hines for the operation of the Tea Room

and that the LCHD was "told by Mr. Hines that he did have all the necessary 'City

Approvals.'"  (*Id.*)

Mr. Foster then "decided to try to pursue a course of action to try to achieve

Voluntary compliance/correction by Mr. Hines."  (*Id.* at 3.)  Several meetings took place

between Mr. Foster's staff, Ms. Castle, the Fire Authority Inspector, and Mr. Hines.  (*Id.*

at 3-4.)  According to Mr. Foster, the request for voluntary compliance consisted of

allowing Mr. Hines "to continue the Tea Room operation while at the same time moving

forward definitively within an agreed-upon timetable to make code violation corrections

(especially the Fire code violations), AND to submit a site plan application to get the site

plan review process started/going."  (*Id.*)

On January 14, 2003, James W. Savage, Building Inspector for the City, sent a letter to Mr. Hines stating that he had inspected the Tea Room and that he had "serious concerns about the floor load." (Ex. C.) He also stated:

> [Y]ou shall restrict the occupancy of the La Petite Victorian Tea Room to 25 persons including employees. This restriction will be reviewed upon your submission of a Floor Load Certification that was requested on January 2, 2003 and required to be submitted to the City by January 15, 2003.

(*Id.*) It is undisputed that Plaintiffs did not submit a Floor Load Certification to the City by January 15, 2003.

From January to March 2003, Plaintiffs, their former attorney Mark L. Fischer, and various City officials met on several occasions. During one of these meetings, Tim King, the City's Fire Inspector, requested that Plaintiffs submit multiple "Action Plans" detailing their progress on correcting fire code violations. Plaintiffs submitted one "Action Plan" on January 30, 2003. (Dfts.' Mot. Ex. N.) Plaintiffs later submitted a revised "Action Plan." (Ex. N. at 6.)

On March 10, 2003, Mr. King acknowledged the receipt of Plaintiff's revised "Action Plan." (Dfts.' Mot. Ex. O.) Mr. King, however, was not satisfied with the revised "Action Plan" and stated in a letter to Mr. Fischer:

> I received your revised action plan today, and I see that either I did not make myself clear or you did not understand the opinion we discussed. The completion times on some of the items are not acceptable; these are life safety issues and need to be completion [sic] in a timely manner. . . . Let it be understood that we have moved from the understanding/explanation of the required code to the completion stage.

(*Id.* at 1.)

Two days later, on March 26, 2003, Mr. Savage sent Plaintiffs a letter informing them that they were "in violation of Sections 110, 115, and 301 of the 2000 Michigan Building Code and Brighton City Code Sections 18-47 and 18-48." (Dfts.' Am. Mot. Ex. P.) Mr. Savage's letter, which contained an Order of Closure, stated: "[i]n order for this order to be lifted, full compliance with applicable codes, ordinances, and regulations must be achieved. No occupancy of the building will be permitted until compliance is achieved." (*Id.*) On May 15, 2003, Plaintiffs appealed the Order of Closure to the City Council. (*See* Dfts.' Mot. Ex. Q (detailing the chronology of events).)

While Plaintiffs' appeal was pending and after it was adjourned to give Plaintiffs an opportunity to work on a resolution, Mr. Fischer met with City Attorney Paul Burns on June 3, 2003. (*See id.*) At this meeting, it was apparently "agreed that [the parties] would work towards operating the Tea Room on the first floor, in conjunction with the Antique Store, on a temporary basis in order for [Plaintiffs] to complete the necessary work and achieve the necessary approvals for the Tea Room to open on the second floor." (*Id.*) Furthermore, Plaintiffs were informed "of the need to submit a site plan application and the need . . . to hire an architect." (*Id.*)

Mr. Fischer met with Mr. Burns again on June 13, 2003. (*Id.* at 2.) Mr. King and Roger Young of the Fire Department also attended this meeting "to discuss the fire safety code issues that would need to be rectified in order to have the Tea Room and the Antique Store on the first floor." (*Id.*) Again, Plaintiffs were informed that they needed to submit a site plan application and hire an architect. (*Id.*) Mr. Burns advised Mr. Fischer of these

requirements again at meetings on June 18 and 19, 2003. (*Id.*)

On June 19, 2003, Mr. Fischer appeared on behalf of Plaintiffs at a City Council meeting. At the City Council meeting, Mr. Fischer informed the City Council and their staff of Plaintiffs' desire to work on improving the second floor in order to operate the Tea Room. (*Id.*) Another meeting held on June 24, 2003 was attended by Mr. Fischer, Mr. Burns, Ms. Castle, and Jack Donaldson (consultant to the Building Code and Enforcement Department). (*Id.*) Compliance issues were again discussed at this meeting, including the need to submit a site plan application and hire an architect. (*Id.*) At the June 24, 2003 meeting, Mr. Fischer agreed that Plaintiffs would submit a site plan application and special use application by July 7, 2003, so that the applications could be placed on the agenda for the July 21, 2003 Planning Commission meeting. (*Id.*)

Plaintiffs did not meet the July 7, 2003 deadline, and Mr. Fischer requested an adjournment of the July 21, 2003 Planning Commission meeting. (*Id.* at 3.) Mr. Fischer, however, later contacted Mr. Burns to indicate that Plaintiffs were interested in continuing their appeal of the Order of Closure before the City Council. (*Id.*) On August 7, 2003, Mr. Fischer attended the City Council meeting requesting a vote on Plaintiffs' appeal. (*Id.*) At that time, Mr. Fischer submitted additional documentation in support of Plaintiffs' appeal. (*Id.*)

Once Plaintiffs' appeal was placed on the agenda, the City Council held two hearings. (*See* Dfts.' Am. Mot. Ex. R. (City Council Hearing Summaries).) Mr. Fischer appeared on behalf of Plaintiffs at each of these hearings. (*Id.* at 1, 5.) At the first hearing held on August 21, 2003, numerous representatives, including Mr. Foster and Ms.

Castle, appeared on behalf of the City to provide the facts giving rise to Plaintiffs' appeal. (*Id.*)  The City Council tabled the appeal on August 21, 2003 to allow for the City and Mr. Burns to assemble a packet of information containing specific documents needed to vote on Plaintiffs' appeal.  (*Id.* at 12.)

On October 2, 2003, the City Council found that "the City's Notice of Closure for 116 W. Main Street was proper in that although there may have been technical deficiencies in the notice, [Plaintiffs were] provided with actual notice of defects prior to the closure over a period of approximately nine (9) months."  (*Id.* at 1.)  Because Plaintiffs had failed to make an application for site plan review, which was required because Plaintiffs' operation of the Tea Room constituted a change in use under the City Ordinance, (*see* Dfts.' Am. Mot. Ex. L, City Ordinance Art. III; *see also* Ex. R. at 1), and the fact that the City Council found that "Life-Safety" issues remain as a result of the outstanding violations of the building and fire codes, Plaintiffs' appeal was denied.  (City Council Hearing Summaries at 3.)

## II.  <u>Standard of Review</u>

Defendants seek judgment on the pleadings pursuant to Rule 12(b)(6) or, in the alternative, summary judgment pursuant to Rule 56.  Because this Court is considering matters outside the pleadings to make its decision, it will apply the standard for summary judgment set forth in Rule 56 of the Federal Rules of Civil Procedure.  FED. R. CIV. P. 12(b)(6).

This Court will grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to

any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists for trial unless, by viewing the evidence in a light most favorable to the nonmoving party, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The moving party bears the burden of informing this Court of the basis for its motion and identifying those portions of the record that establish the absence of a material issue of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has met its burden, Rule 56(e)(2) requires the nonmoving party to look beyond the pleadings and designate specific facts showing that a genuine issue exists for trial. FED. R. CIV. P. 56(e)(2); *Celotex*, 477 U.S. at 322-24, 106 S. Ct. at 2552-53. It is not enough that the nonmoving party comes forward with the "mere existence of a scintilla of evidence . . . ," *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512, or some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Rather, the nonmoving party must present significant probative evidence in support of its opposition to the motion for summary judgment. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

## III.  <u>Applicable Law and Analysis</u>

Plaintiffs' Complaint contains six separate counts. Counts I-III are brought pursuant to 42 U.S.C. § 1983, which provides a civil cause of action to anyone who suffers a deprivation of their constitutional rights by a person acting under the color of state law.

Count IV is brought pursuant to 42 U.S.C. § 1985(3), which provides a civil cause of action when two or more persons conspire to deprive another of the equal protection of the laws. Count V invokes 42 U.S.C. § 1981, which provides that all persons regardless of race shall have the right to make and enforce contracts. Count VI asserts a claim for tortious interference with contractual relations under Michigan common law.

Defendants move for summary judgment on all of counts in Plaintiffs' Complaint.

**A.      Denial of Equal Protection**

Count I of Plaintiffs' Complaint, which consists of seventy-one (71) numbered paragraphs, alleges that Defendants violated the Equal Protection Clause of the 14th Amendment. (Compl. ¶¶ 20-90). Fairly understood, Plaintiffs are asserting that Defendants violated the Equal Protection Clause based on a selective prosecution theory. (*See* Pls.' Am. Resp. Br. at 25-30.)

"Sometimes the enforcement of an otherwise valid law can be a means of violating constitutional rights by invidious discrimination. To address this problem, courts have developed the doctrine of selective enforcement." *Futernick v. Sumpter Twp.*, 78 F.3d 1051, 1056 (6th Cir. 1996). To prevail on a selective enforcement claim, a plaintiff must demonstrate the following three elements:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991). "With regard to the first

element, 'it is an absolute requirement that the plaintiff make at least a prima facie

showing that similarly situated persons outside [his or] her category were not

prosecuted.'"[3] *Gardenshire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)(quoting

*Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997)). "Furthermore, there is a

strong presumption that the state actors have properly discharged their official duties, and

to overcome that presumption the plaintiff must present clear evidence to the contrary;

'the standard is a demanding one.'" *Stemler*, 126 F.3d at 873 (quoting *United States v.*

*Armstrong*, 517 U.S. 456, 463, 116 S. Ct. 1480, 1486 (1996)).

Plaintiffs argue that Defendants singled them out based on Mr. Hines's race by

requiring that they submit a site plan in order to expand the café from the first floor to the

second floor. More specifically, Plaintiffs contend that Defendants treated them

differently than similarly situated businesses in downtown Brighton in three respects: (1)

Defendants allowed similarly situated businesses to expand without submitting a site

plan, yet Defendants prohibited Plaintiffs from expanding without submitting a site plan;

---

[3]Defendants argue that to prove a violation of equal protection on the basis of selective prosecution, "a plaintiff must prove the same elements as are required to establish a disparate treatment claim under Title VII, i.e., under the *McDonnell Douglas/Burdine* framework." (Dfts.' Br. at 11 (citing *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988).) Plaintiffs dispute whether the *McDonnell Douglas/Burdine* framework applies to their equal protection claim. This Court does not believe it needs to determine whether the *McDonnell Douglas/Burdine* framework applies to Plaintiff's selective prosecution claim, although, as stated *supra*, Sixth Circuit precedent seems to require something similar to the *McDonnel Douglas/Burdine* burden-shifting framework. *See Gardenshire*, 205 F.3d at 318 (stating that a plaintiff must establish a prima facie case). Nevertheless, this Court believes that Defendants are entitled to summary judgment on Plaintiffs' selective prosecution claim.

(2) Defendants furnished site plan application packets to similarly situated businesses but failed to give Plaintiffs a site plan application packet; and (3) Defendants took actions similar to those taken against Plaintiffs only when the operation of similarly situated businesses was a clear and present danger.

Plaintiffs proffer evidence they obtained from reviewing "files of similar businesses to ascertain the treatment of comparable business establishments." (Pls.' Supp. Br. at 9.) Plaintiffs argue that they requested three separate "files on comparable establishments to review," but only received two files. (*Id.* at 9 n.1.) In arguing that Defendants allowed similarly situated businesses to expand without submitting a site plan, Plaintiffs refer only to an establishment known as Anjou Bakery, which is located at 501 W. Main Street in downtown Brighton. The file on Anjou Bakery contains an Application for Site Plan Review, submitted by Lindhout Associates on behalf of Anjou Bakery, requesting that the City approve an addition of "232 square feet to the rear of the existing 1,412 square feet, single-story building." (*See* Pls.' Supp. Br. Ex. 4 & 5.) Plaintiffs argue that because the City's file on Anjou Bakery did not contain any site plan, but contained only an Application for Site Plan Review, this is sufficient evidence to raise a genuine issue of material fact with respect to Defendants' alleged selective enforcement.

This Court disagrees with Plaintiffs and finds that this evidence is insufficient to raise a genuine issue of material fact with respect to whether Defendants selectively enforced the relevant ordinances and codes against Plaintiffs on the basis of Mr. Hines's race. First, Plaintiffs fail to provide any evidence of the proprietor of Anjou Bakery's race. This would seem to prevent Plaintiffs from relying on the Anjou Bakery expansion

to support their selective enforcement claim, which asserts that Defendants treated Plaintiffs differently on the basis of Mr. Hines's race.

Second, this Court does not believe that Plaintiffs have offered sufficient evidence from which a reasonable jury could conclude that Anjou Bakery is "similarly situated." As stated by the Seventh Circuit, "[i]t is clear that similarly situated individuals must be very similar indeed."[4] *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004)(citing *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002)). It appears from the information proffered by Plaintiffs on the Anjou Bakery expansion that Anjou was seeking to add on to the rear of its existing, one-story building. Plaintiffs, on the other hand, sought to expand the first-floor café to the second floor of their existing building to allow groups of up to 400 people to convene. (*See* Dfts.' Am. Mot. Ex I at 1.) This Court does not believe Plaintiffs' identified comparator, Anjou Bakery, is sufficiently similar for the purposes of Plaintiffs' selective enforcement claim.

Moreover, to the extent Plaintiffs are relying on the three businesses Mr. Foster was asked to identify in his deposition, Plaintiffs' reliance on these businesses as comparators is without merit. These businesses, like Plaintiffs' business, were shut down for various reasons. (*See* Pls.' Supp. Br. Ex. 3, Foster Dep. at 43-45 (describing the three businesses and the reasons they were ordered to close).) Assuming these businesses were "similarly situated," the reasons these businesses were shut down is irrelevant to Plaintiffs' equal

---

[4]"In the zoning context, projects which seek different types of variances are not similarly situated." *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006)(citing *Purze*, 286 F.3d at 455-56)).

protection claim because it is not evidence of "similarly situated" businesses that were

treated differently. *See Gardenshire*, 205 F.3d at 318.

As stated above, Plaintiffs also argue that Defendants failed to give them a site plan

application packet[5] and that Defendants purportedly shut down the three other businesses

identified by Mr. Foster because they were "clear and present" dangers. Plaintiffs

seemingly are using this evidence to establish that Defendants were biased against them

in support of a claim for "vindictive prosecution." "'Vindictive prosecution' is

prosecution to deter or punish the exercise of a constitutionally protected right. The

plaintiff must show: (1) exercise of a protected right; (2) the prosecutor's 'stake in the

exercise of that right'; (3) the unreasonableness of the prosecutor's conduct; and,

presumably, (4) that the prosecution was initiated with the intent to punish the plaintiff

for exercise of that protected right." *Futernick*, 78 F.3d at 1056 n. 7. Plaintiffs'

vindictive prosecution claim must fail because while "[t]he attempt to expand their

business was the exercise of a constitutionally protected right," (Pls.' Resp. Br. at 28),

---

[5]Even assuming it is true that Defendants failed to give Plaintiffs a site plan
application packet, there is no real dispute that Plaintiffs' former attorney, Mr. Fischer,
was made aware of the site plan requirement during Plaintiffs' appeal to the City Council.
In correspondence to and from the City, the site plan requirement is mentioned in no
uncertain terms. (*See, e.g.*, Dfts. Am. Mot. Ex. N at 8, Ex. Q at 1-2.) Moreover, it is
undisputed that Plaintiffs, who were not architects or engineers, did not have technical
expertise to complete the site plan. (*See* Pls.'s Supp. Resp. Ex. 1, Castle Dep. at 16
("[T]he site plan typically is prepared by a professional. It's required actually that it be
an engineered, you know, stamped plan. And sometimes they may have to get other
professionals . . . .); *see also* Pls. Supp. Resp. Ex. 3, Foster Dep. at 66 (explaining that "a
site plan application will consist of drawings prepared by a licensed architect and/or
engineer"); Dfts.' Am. Mot. Ex. L, City Ordinance Art. III, §§ 82-92, 82-94 (requiring
that a preliminary and final site plan be prepared by a "registered architect or professional
engineer").)

this Court does not believe that attempting to expand one's business without complying with the applicable ordinance and codes is a constitutionally protected right. Consequently, Defendants are entitled to summary judgment with respect to any vindictive prosecution claim being asserted by Plaintiffs.

Finally, Plaintiffs argue that Mr. Foster's characterization of the situation as "sensitive" in his May 22, 2003 memorandum to the City Council provides evidence that Mr. Foster "elected to treat [Mr.] Hines differently" based on his race. (Pls.' Resp. Br. at 27.) Assuming without deciding that this evidence is sufficient to create a genuine issue of material fact as to whether Mr. Foster treated Plaintiffs differently based on Mr. Hines's race, Plaintiffs' equal protection claim fails for the reason outlined above: they have failed to offer evidence that similarly situated business owners of a different race were not required to submit a site plan application.

In conclusion, Plaintiffs have failed to proffer evidence from which a reasonable jury could conclude that they were treated differently than similarly situated individuals on the basis of Mr. Hines's race. Consequently, Defendants are entitled to summary judgment as to Count I of Plaintiffs' Complaint.

## B.     Denial of Substantive Due Process

Plaintiffs' second cause of action, entitled "Denial of Substantive Due Process," alleges that Defendants' actions in prohibiting Plaintiffs from operating the second-floor Tea Room were arbitrary and capricious because they "were taken without basis in fact or law." (Compl. ¶ 91-100.) The Sixth Circuit has stated that "[s]ubstantive due process 'serves as a vehicle to limit various aspects of potentially oppressive government

action.'" *Valot v. Southeast Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997)(quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)). There are two categories of substantive due process claims: "(1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'" *Id.* (citations omitted). "Where the government action does not deprive a plaintiff of a particular constitutional guarantee or shock the conscience, that action survives the scythe of substantive due process so long as it is rationally related to a legitimate state interest." *Id.* In such a case, a plaintiff "bears the burden to show that [d]efendants' decision was not rationally related to a legitimate state interest." *Id.*

As stated above with respect to Plaintiffs' equal protection claim and below with respect to Plaintiffs' procedural due process claim, this Court does not believe that a genuine issue of material fact exits as to whether Plaintiffs were denied their constitutional right to equal protection under the laws or procedural due process. Nor does this Court believe that there is a genuine issue of material fact as to whether Defendants' conduct was so egregious as to "shock the conscience." Consequently, in order to succeed on their substantive due process claim, Plaintiffs must prove that Defendants' decision to issue the notice of closure was irrational and unrelated to a legitimate state interest.

Defendants contend that their actions were based on legitimate public health, safety, and welfare concerns, including the "Life-Safety" issues described at the City Council hearings. (*See generally* Dfts.' Am. Mot. Ex. R.) Plaintiffs argue that they "were denied substantive due process when [D]efendants gave them thirty (30) days to cure any

defects, but then were <u>completely</u> shut down two (2) days later." (Pls.' Resp. Br. at 14 (emphasis in original).) Plaintiffs further contend that Defendants acted arbitrarily and capriciously by failing to provide them with a list of defects from the building department or any other City entity until after Plaintiffs' appeal of the Notice of Closure was denied. (*Id.*) Finally, Plaintiffs assert that Defendants acted arbitrarily and capriciously when they required Plaintiffs to obtain a floor load certification, and then, after Plaintiffs obtained a floor load certification, told Plaintiffs that the floor load certification was not important. (*Id.*)

Even when considering the evidence presented in a light most favorable to Plaintiffs, this Court concludes that Defendants are entitled to summary judgment on Plaintiffs' substantive due process claim. The requirements imposed by Defendants were based on "Life-Safety" issues, which this Court believes are legitimate interests. Moreover, this Court believes Defendants' decision to issue a Notice of Closure was rationally related to the "Life-Safety" issues that arose as a result of Plaintiffs' violations of building and fire codes, as well as the City Ordinance. Consequently, Defendants are entitled to summary judgment on Plaintiffs' substantive due process claim.

### C.      Denial of Procedural Due Process

Plaintiffs' third cause of action, entitled "Denial of Procedural Due Process," consists of the following three paragraphs:

> 102.  That Plaintiffs were never given a clear notion of how to go about achieving the expansion of the café, but ended up being told to deal with Defendant Castle.

> 103.  That Defendants denied Plaintiffs both procedural and

substantive due process when they pretended to be working out their differences, but never intended to resolve any differences, e.g., telling Plaintiffs that they would have time to correct the deficiencies, but activating a notice of closure <u>three (3) days later</u> and showing up with the City Police Department.

104.    That Defendants denied Plaintiffs both substantive and procedural due process when they called up customers booked by Plaintiffs, particularly, Plaintiff Simpson, and caused them to cancel bookings.

(Compl. ¶¶ 102-04 (emphasis in original).)

The Due Process Clause of the Fourteenth Amendment guarantees that "[n]o State . . . shall deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Procedural due process claims are analyzed under a two-part test. "First, the court must determine whether the interest at stake is a protected liberty or property right under the Fourteenth Amendment. Only after identifying such a right [does a court] continue to consider whether the deprivation of that interest contravened notions of due process." *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002)(citations omitted). Simply stated, "[t]he fundamental elements of procedural due process are notice and an opportunity to be heard." *Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 357 (6th Cir. 1992)(citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 303, 313, 70 S. Ct. 652, 657 (1950)).

Defendants contend that Plaintiffs' procedural due process claim must fail because they cannot establish that they were denied a constitutionally protected liberty or property interest without the appropriate process. Plaintiffs assert in their amended response brief that their former attorney, Mr. Fischer, argued that Sections 110, 115, and 301 of the 2000

Michigan Building Code were violated when he appeared before the City Council. Plaintiffs contend that the City Council acknowledged that "there may have been technical deficiencies in the Notice" of Closure. (*See* Pls.' Am. Resp. at 15 (quoting Ex I of Dfts.' Am. Mot. for Summ. Jdgmt.).) At bottom, Plaintiffs argue that the City Council's denial of their appeal was erroneous because the Order of Closure should have been reversed when the City Council found that it had "technical deficiencies."

Plaintiffs' procedural due process claim is without merit. Even if a reasonable jury could find that Plaintiffs were deprived of a protected liberty or property interest, the record raises no material question of fact with respect to the process afforded to Plaintiffs. Plaintiffs appealed the Order of Closure to the City Council. Moreover, Plaintiffs concede that "Mr. Fischer aired his arguments before the City Council . . . ." (Pls.' Am. Resp. Br. at 15.) Thus, there is no evidence in the record establishing that Plaintiffs were denied an opportunity to be heard. Therefore, Defendants are entitled to summary judgment with respect to Count III of Plaintiffs' Complaint.

### D.     Qualified Immunity

In their brief, Defendants argue that Mr. Foster and Ms. Castle are entitled to qualified immunity. Because the Court concludes that Defendants did not violate Plaintiffs' constitutional rights, it need not reach the issue of qualified immunity. *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007)(quoting *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156)("If, and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case.'")

### D.     Conspiracy Under 42 U.S.C. § 1985(3)[6]

Count IV of Plaintiffs' Complaint alleges that Defendants "conspired to stop

Plaintiffs in their efforts to expand the café for illicit reasons, including race, through the

use of illicit means."  (Compl. ¶106).  The Sixth Circuit has stated:

> To establish a claim under 42 U.S.C. § 1985(3), a plaintiff
> must prove (1) a conspiracy involving two or more persons
> (2) for the purpose of depriving, directly or indirectly, a
> person or class of persons of the equal protection of the laws
> and (3) an act in furtherance of the conspiracy (4) which
> causes injury to a person or property, or a deprivation of any
> right or privilege of a citizen of the United States.  *Hilliard v.*
> *Ferguson*, 30 F.3d 649, 652-53 (5th Cir. 1994).  Plaintiff must
> also establish that the conspiracy was motivated by class-
> based animus.

*Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994).

Defendants contend that, like their equal protection claim, Plaintiffs' conspiracy

claim must fail because there is no evidence that the alleged conspiracy was motivated by

class-based animus.  Defendants also argue that the proffered evidence shows that the

Order of Closure was issued as a result of Plaintiffs failure to comply with the applicable

building and fire codes.

In their amended response brief, Plaintiffs point to allegations in their complaint to

support their contention that Mr. Foster and Ms. Castle "conspired" to deprive them of

---

[6]Although the allegations contained under Count IV of Plaintiffs' Complaint do
not specifically refer to 42 U.S.C. § 1985(3), paragraph thirteen of the Complaint states
that Plaintiffs are bringing their "claims" pursuant to this specific section.  (Compl. ¶13.)
Therefore, the Court will construe Count IV as such.

their constitutional rights.[7]  (Pls.' Resp. Br. at 21 (citing Compl. ¶ 106).)  This action, however, has progressed beyond the pleading stage and Plaintiffs must look beyond the pleadings and designate specific facts showing that a genuine issue exists for trial.  Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 322-24, 106 S. Ct. at 2552-53.  Because Plaintiffs have failed to present any evidence supporting their allegation that Defendants conspired to deprive them of their constitutional rights, this Court believes that summary judgment in favor of Defendants is warranted with respect to Count IV of Plaintiffs' Complaint.

### E.    Denial of Right to Enforce Contracts Under 42 U.S.C. § 1981

Plaintiffs allege in Count V of their Complaint that Defendants learned of the contractual arrangement entered into between Plaintiffs and "tortuously [sic] acted to destroy that relationship . . . ." in violation of 42 U.S.C. § 1981.[8]  (Compl. ¶¶111-14).

---

[7]Nor have Plaintiffs pointed to any evidence of a conspiracy in their supplemental brief.  (*See* Doc. No. 71.)

[8]This statutory provision provides:

> (a) Statement of Equal Rights.  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
> (b) "Make and enforce contracts" defined.  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
> (c) Protection against impairment.  The rights protected under this section are protected against impairment by

"Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship."  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476, 126 S. Ct. 1246, 1250 (2006).  Defendants do not dispute that Plaintiffs had a contractual relationship.  Defendants do, however, take issue with Plaintiffs' contention that they were discriminated against on the basis of race.

The burden shifting approach developed by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green*[9], and later refined in *Texas Dep't of Cmty. Affairs v. Burdine*[10], applies to § 1981 claims.  *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S. Ct. 2363, 2377-78 (1989).  Under this well-established framework, the plaintiff has the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination.  *Patterson*, 491 U.S. at 186, 109 S. Ct. at 2377-78.  Once the plaintiff establishes a prima facie case, an inference of discrimination arises.  *Id.* at 187, 109 S. Ct. at 2378.  In order to rebut this inference, the defendant must present evidence of a legitimate, non-discriminatory reason for its conduct.  *Id.*  The burden then shifts back to the plaintiff to demonstrate that the defendant's proffered reason was pretextual.

nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

[9]411 U.S. 792, 93 S. Ct. 1817 (1973).

[10]450 U.S. 248, 101 S. Ct. 1089 (1981).

*Id.*

Defendants contend that Plaintiffs have not proffered evidence to show that Defendants' non-discriminatory reasons for issuing the Order of Closure were pretextual. This Court agrees. Even if Plaintiffs could establish a prima facie case of discrimination, Defendants have produced evidence to show that issuing the Order of Closure was based on legitimate, non-discriminatory reasons – i.e., Plaintiffs' failure to correct the existing code violations in the operation of the second floor Tea Room. Plaintiffs fail to present evidence demonstrating that a genuine issue of fact exists as to whether Defendants' proffered reasons were pretextual.[11] Therefore, Defendants are entitled to summary judgment with respect to Count V of Plaintiffs' Complaint.

### G.    Tortious Interference With Contractual Relations

Count VI alleges that Defendants tortiously interfered with the contractual relationship of Plaintiffs under Michigan law. Plaintiffs must establish the following elements to prevail on their tortious interference with a contractual relationship claim: "(1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant." *Tata Consultancy Servs. v. Systems, Int'l*, 31 F.3d 416, 422 (6th Cir. 1994)(citations omitted). More importantly, with respect to the third element of their tortious interference with a contractual relationship claim, Plaintiffs must establish that Defendants committed a "per se wrongful act" or "a lawful act with malice and unjustified in the law." *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 251 Mich. App. 125, 131,

---

[11]Indeed, Plaintiffs only make reference to their Complaint when arguing that they have "stated" a sustainable § 1981 claim. (*See* Pls.' Am. Resp. 20-21.)

649 N.W. 2d 808, 812 (2002)(citations omitted).  "If defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference."  *Id.*

As an initial matter, this Court does not believe there is a genuine issue of fact as to whether Defendants' acts were wrongful per se.  Defendants issued the Order of Closure due to Plaintiffs' repeated failures to comply with the applicable codes, and Defendants provided Plaintiffs with ample opportunity to comply with the applicable codes and communicated their willingness to achieve an amicable result.  Nevertheless, Plaintiffs seem to argue that Ms. Castle's act of showing "up at an event during the operation of the tea room, with armed with [*sic*] police officers, demanding that she be allowed to conduct a count of the guests because of a non-existence [*sic*] floor standard" is evidence that corroborates Defendants' malice in seeking to close their business down.

This Court does not believe that Ms. Castle's act of showing up at the Tea Room to count occupants is sufficient to establish malice.  Ms. Castle was in the first floor of Mr. Hines's building at the cashier's counter when she was counting the occupants leaving from the second floor.  (Castle Dep. 26-27.)  At this time, Plaintiffs were allowed to have "25 persons including employees" on the second floor of Mr. Hines's building.  (*See* Dfts.' Am. Mot. Ex. M, 1/14/03 Savage Letter.)  Plaintiffs do not contend that Ms. Castle was trespassing or otherwise not permitted to be on the first floor of Mr. Hines's building at the time she was counting occupants.  Finally, to the extent Plaintiffs argue that malice can be inferred based on Ms. Castle's use of profanity when she showed up at the Tea Room, Ms. Castle explained that her use of the word "bullshit" was in response to an

accusation by Mr. Hines. (*Id.* at 44.) Consequently, Defendants are entitled to summary judgment as to Count VI of Plaintiffs' Complaint.

### G. Defendant City of Brighton's Liability

Because Plaintiffs have failed to establish a deprivation of their constitutional rights, they cannot establish liability against the City of Brighton. As stated by the Sixth Circuit, "the determination that the City's officials did not violate the plaintiffs' constitutional rights resolves the claim against the City as well." *Bukowski v. City of Akron*, 326 F.3d 702, 712-13 (6th Cir. 2003). Consequently, Defendants are entitled to summary judgment with respect to any claim Plaintiffs are asserting against the City of Brighton.

## V. <u>Conclusion</u>

In conclusion, this Court believes that Defendants are entitled to summary judgment with respect to all of Plaintiffs' claims.

Accordingly,

**IT IS ORDERED** that Defendants' amended motion for summary judgment is **GRANTED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Joan M. Barnes, Esq.
James E. Tamm, Esq.